UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

Michelle Peters,

Plaintiff

v.

Clark County,

Defendant

Case No. 2:20-cv-01811-CDS-EJY

**Order Granting Defendant's Motion for Summary Judgment and Closing Case**

[ECF No. 27]

This employment case arises out of plaintiff Michelle Peters' employment by defendant Clark County as an Elections Officer. The parties dispute both the reason behind and the date of Peters' termination. She alleges that she was fired because she filed a workers' compensation claim after she twisted her knee at work on May 17, 2018. The county alleges that she was a temporary employee for the June 2018 primary election cycle and that her employment ended at the earliest practicable date following the June 2018 primary.

Peters brings this suit, alleging that the county violated the Americans with Disabilities Act (ADA), Nevada state law regarding disability discrimination (Nevada Revised Statutes (NRS) § 613.330), and that she suffered both race discrimination and a hostile work environment. Compl., ECF No. 1 at 5–11. Clark County now moves for summary judgment (ECF No. 27), which Peters opposes (ECF No. 33), and to which Clark County replied (ECF No. 36). For the reasons set forth herein, I grant Clark County's motion for summary judgment and direct the Clerk of Court to enter judgment in favor of the defendant and close this case.

## I. Background

Michelle Peters was employed by Clark County as an Elections Officer in the Elections Department in March 2018. Resp., ECF No. 33 at ¶ 3. While she had worked in the Elections Department in 2017 on a part-time temporary basis, the Elections Officer position entailed new responsibilities and came with benefits and a pay raise over her prior position. *Id.* at ¶ 1–3. The letter offering Peters the job states that the Elections Officer position, too, was temporary with a "length of employment . . . limited to the duration of the program or project assigned[,]" and specifically stated that her "limited permanent status expires on 06/29/2018 unless extended by the department head." Offer Letter, ECF No. 29-2. Peters signed both the offer letter and a second letter of agreement, checking the box describing the position information as well as specifically marking next to the end date of 06/29/2018. Letter of Agreement, ECF No. 29-3. She accepted the job on March 23, 2018, and began immediately. ECF No. 33 at ¶ 4.

Peters twisted her knee at work on May 17, 2018, and then was transported to a hospital. *Id.* at ¶ 7. Peters' injury report states that she got up from her chair and shouted, "my knee, I twisted my knee." Injury Notice, ECF No. 33-6 at 2. The injury allegedly occurred after her employer had just placed a new, sticky floor mat underneath her chair. *Id.* at 7. When she stood and turned to walk out of her cubicle, her foot stuck to the new mat and caused torsion at the knee. *Id.* This impairment physically limited her and affected her ability to walk. *Id.* She filed a workers' compensation claim that day. *Id.* at ¶ 11. The claim was initially denied, but the denial was reversed on September 25, 2018. *Id.*; ECF No. 33-6 at 4–6. As a result of the injury, Peters was excused from work between May 17 and May 22, but her doctor warned her against lifting more than 10 pounds, using the stairs, or running. ECF No. 33 at ¶ 8–9; First Excusal Note, ECF No. 29-9. On May 29, 2018, Peters saw her doctor again and was excused from work on that date. ECF No. 33 at ¶ 10. Her supervisor, Elisset Maestri, allegedly told Peters that she could only return if she was "100% full duty." Peters Decl., ECF No. 33-2 at ¶ 10. Peters' doctor thus wrote her a note to excuse her attendance between May 29—June 15, 2018. *Id.*; Second Excusal Note,

ECF No. 29-9 at 2. Peters contends that she could have been accommodated and returned to work sooner than June 15, but that her supervisor prohibited her from doing so until she was "100%." ECF No. 33-2 at ¶ 10.

The primary election for which Peters was hired as an Elections Officer took place on June 12, 2018. ECF No. 33 at ¶ 12. A letter dated June 22, 2018, printed on official letterhead, states that Peters failed to complete her probationary period and that she was terminated from employment effective May 18, 2018. ECF No. 33-3 at 2. However, there are some discrepancies as to the effective date of her termination. An internal document prepared by Clark County's Elections Department on June 18, 2018, states that Peters was terminated effective May 17, 2018. ECF No. 33-4 at 2. A third form, terminating Peters' Public Employees' Retirement System (PERS) benefits, was prepared on June 28, 2018, and likewise dated Peters' termination effective May 17, 2018. ECF No. 33-5 at 2.

Peters, who describes herself as a "black, African-American," also alleges that she was racially discriminated against while she worked at the Elections Office. ECF No. 23 at 4. She states that she was excluded from social activities by her Hispanic supervisors and that her coworkers talked about her in Spanish. ECF No. 33-2 at 8. Peters notes that her own Spanish fluency is "not too good," as she knows "a word here and there but nothing beyond that." Peters Depo., ECF No. 28-1 at 22:18–24:18. On one occasion, her coworkers told her that she needed 3-D movie glasses to complete training, when, in fact, Peters did not need such glasses and went on a "wild goose chase" to find them. ECF No. 33-2 at 8–9. On another occasion, a coworker of Peters who spoke Spanish informed her that her supervisors spoke about Peters as though she were "a dog." *Id.* Peters did not report a racially hostile work environment to the Office of Diversity (OOD). ECF No. 28-1 at 99. She claims that she did report it to a supervisor, Mrs. Portillo, who was uninvolved in the environment, and she alleges that Portillo failed to follow protocol for escalating Peters' complaint to the Office of Diversity or the HR Department. ECF No. 33-1 at ¶ 15. Peters states that she told Portillo that supervisors in the office needed harassment and

discrimination training because the election department could face a lawsuit based on what was occurring in the office. *Id.* Peters believed it was "obvious" that she was talking about race issues when she reported the issues to Portillo, given the context of the conversation and the fact that Peters is African American, while her antagonists were Hispanic Spanish speakers. *Id.* Peters contends that Portillo violated Clark County's anti-harassment policy by not investigating her complaint. *Id.*

## II. Legal standard

Federal Rule of Civil Procedure (FRCP) 56(c) provides that summary judgment must be granted when there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the court must not make credibility determinations or weigh conflicting evidence. *Id.* at 255. Rather, the court must view the evidence in the light most favorable to the non-moving party, drawing all "justifiable inferences" in its favor. *Id.* (internal citation omitted).

The movant bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits which demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323; *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Once the moving party has met its burden of production, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, set forth specific facts showing that there is a genuine issue for trial. If the nonmoving party fails to produce enough evidence to show a genuine issue of material fact, the moving party wins. *Id.* Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

## III. Discussion

Peters brings four claims: (1) retaliatory discharge for filing a workers' compensation claim, (2) race discrimination and hostile work environment in violation of 42 U.S.C. § 1981, (3) disability discrimination in violation of NRS § 613.330, and (4) violation of the Americans with Disabilities Act (ADA). ECF No. 1 at 5–11. Clark County seeks summary judgment on all four claims.

### *a. Clark County is entitled to summary judgment on Peters' claims under the ADA and Nevada's law against disability discrimination.*

Courts analyze disability-discrimination claims using the burden-shifting framework described by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[1] *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1093 (9th Cir. 2001). Under this analysis, a plaintiff must first establish a prima facie case of discrimination by demonstrating three factors: (1) she is a disabled person within the meaning of the statute; (2) she is a qualified individual with a disability; and (3) she suffered an adverse employment action because of her disability. *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1155 (9th Cir. 2010). If the plaintiff establishes her prima facie case, the burden of production shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action. *Id.* If the defendant meets this burden, the plaintiff must then raise a triable issue of material fact as to whether the defendant's proffered reasons for the termination are mere pretext for unlawful discrimination. *Id.*

#### *1. Peters demonstrates a disability within the meaning of the statute.*

In pertinent part, the ADA defines "disability" as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2). When deciding whether an impairment is substantially limiting, courts "must consider the nature and severity of the [plaintiff's] impairment, the duration or expected

---

[1] Nevada law requires courts to analyze state law disability-discrimination claims under the same framework as the federal substantive law. *See Littlefield v. Nevada, ex. rel. Dep't of Pub. Safety*, 195 F. Supp. 3d 1147, 1152 (D. Nev. 2016) ("Nevada courts apply the ADA approach to plaintiff's state law claims."). I thus consider Peters' ADA claim and her state law disability-discrimination claim together.

duration of the impairment, as well as the permanent or long[-]term impact of the impairment." *Fraser v. Goodale*, 342 F.3d 1032, 1038 (9th Cir. 2003) (internal citations omitted). Peters demonstrates that her knee injury constitutes a physical impairment that substantially limits her major life activities, which the county does not dispute.

2. *Peters does not demonstrate that she is a qualified individual with a disability, so summary judgment is thus appropriate on her ADA claim and its state equivalent.*

To determine whether a plaintiff is a "qualified individual," courts engage in a two-step inquiry to analyze (1) "whether the individual satisfies the prerequisites of the job; more specifically, whether 'the individual satisfies the requisite skill, experience, education, and other job-related requirements of the employment position such individual holds or desires"; and (2) "whether 'with or without reasonable accommodation,' the individual is able to 'perform the essential functions of such position.'" *Anthony v. Trax Int'l Corp.*, 955 F.3d 1123, 1128 (9th Cir. 2020) (quoting 29 C.F.R. § 1630.2(m)). "An individual who fails to satisfy the job prerequisites cannot be considered 'qualified' within the meaning of the ADA unless she shows that the prerequisite is itself discriminatory in effect." *Johnson v. Bd. of Trustees of Boundary Cty. Sch. Dist. No. 101*, 666 F.3d 561, 567 (9th Cir. 2011). "An employee must show she was qualified at the time of the adverse employment action, rather than at some earlier or later time." *Anthony*, 955 F.3d at 1129.

The undisputed material facts of this case demonstrate that Peters could not satisfy the prerequisites of the job at the time her employment with the county ended. As Peters points out, "[t]here is no dispute that she was doing a good job at the time she was injured. The question is whether she could have performed the essential functions of the Elections Officer job after she was injured and developed her disability[.]" ECF No. 33 at 20–21. Clark County asserts that Peters could not fulfill the essential functions of the job after her injury. ECF No. 27 at 11–12. Evidence of whether a particular function is essential includes, "(i) the employer's judgment as to which functions are essential; (ii) written job descriptions prepared before advertising or interviewing applicants for the job; (iii) the amount of time spent on the job performing the

function; (iv) the consequences of not requiring the incumbent to perform the function," and other considerations. 29 C.F.R. § 1630.2(n)(3). "Such evidence, however, is not conclusive: 'an employer may not turn every condition of employment which it elects to adopt into a job function, let alone an essential job function, merely by including it in a job description.'" *Rohr v. Salt River Project Agric. Imp. & Power Dist.*, 555 F.3d 850, 864 (9th Cir. 2009) (quoting *Cripe v. City of San Jose*, 261 F.3d 877, 887 (9th Cir. 2001)).

The job posting for the Elections Officer position listed as physical demands: "[m]obility to work in a typical office setting, use standard office equipment, and to drive a motor vehicle . . . lift and carry up to 50 pounds[,] stamina to deal with stringent deadlines," and vision, hearing, and speech. ECF No. 29-18 at 2. It adds that "[a]ccommodation may be made for some of these physical demands for otherwise qualified individuals who require and request such accommodation." *Id.* These physical demands comport with common sense in light of the job's duties, which include both less physically demanding office work—like filing, operating the phone system, data entry, and mailing—as well as more physically demanding out-of-office work—like configuring and transporting voting machines and driving a motor vehicle to deliver ballot materials and supplies. *Id.* Clark County argues that it is "essential that employees be able to move regularly throughout the office, drive vehicles, and be on their feet a good portion of the day." ECF No. 27 at 11. Peters contends that lifting heavy boxes was a marginal task of the position and that she may have been able to lift them using wheeled dollies. ECF No. 33-2 at ¶ 7. She adds that there "may have been a short time when [she] was unable to drive," and that her "doctor ordered [her] to keep [her] leg elevated as much as possible and [she] think[s] that [she] could have done that while performing the office work[.]" *Id.* Peters concludes that she was "somewhat limited," but it seemed that she "could have been accommodated by restructuring the job slightly and having [her] do mostly clerical duties while keeping [her] leg elevated at [her] desk for most of the time." *Id.*

Undercutting Peters' declaration that she could have worked in a restructured position is her own deposition testimony, in which she admits that her doctor instructed her not to return to work, and based on that instruction, she refused to return. ECF No. 28-1 at 106. She used crutches for two or three months following her injury (*id.* at 105), she "still couldn't put pressure on [her knee] and it was still swelling" (*id.* at 106), and she took an "extremely long time to heal" (*id.* at 108). When asked whether Peters had any contact with the elections department during the time that she was not working following the injury, she responded that her supervisor, Ellie, called every day, to which Peters said, "I'm off work under a doctor's order." *Id.* at 109. Ellie would say, "I want to know when you're coming back," and Peters would tell her, "I have no idea when this is going to heal or when it's going to be over." *Id.* at 110. When Ellie called again the next day, it was "pretty much" the same conversation. *Id.*

But for Peters' self-serving declaration, the evidence in the record is clear that she could not have performed the essential duties of an Elections Officer. Because the only evidence supporting her argument is Peters' own declaration (ECF No. 33-2), this case is similar to that of *Kennedy v. Applause, Inc.*, 90 F.3d 1477 (9th Cir. 1996). In *Kennedy*, the plaintiff alleged that her employer violated the ADA by terminating her because she suffered from chronic fatigue syndrome. The district court granted summary judgment for the employer, finding that the plaintiff failed to establish that she was qualified to perform her job, with or without reasonable accommodation. On appeal, the Ninth Circuit noted that the district court's ruling was supported by the medical opinion of the plaintiff's treating physician, the plaintiff's statements on state-disability and Social-Security forms wherein she "represented she was completely disabled for all work-related purpose," *and* rejected plaintiff's deposition testimony that she was not totally disabled as a basis for demonstrating an issue of fact. *Kennedy*, 90 F.3d at 1480–82. The court found that the plaintiff's "uncorroborated and self-serving testimony" contradicted her prior sworn statements and medical evidence, and therefore, was insufficient to create a "genuine dispute" concerning whether she was totally disabled. *Id.*

Peters' declaration alone cannot create a genuine dispute of material fact as to whether she was able to perform the essential functions of the Election Officer position following her injury. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2022) (noting that courts refuse to find a genuine issue of fact where the only evidence presented is uncorroborated and self-serving). The only evidence supporting her claim that she could have performed some of the essential functions of her job is her own self-serving declaration. But the record contradicts her statement and reveals that the earliest she was cleared to work was almost a year after her May 2018 workplace injury. Workers' Comp. Hr'g Order, ECF No. 33-10 at 4, ¶ 10 (medical doctor concludes that Peters could have returned to modified work in March 2019). The findings of fact from her workers' compensation appeal reveal that Peters did not only suffer a knee injury, but also endured a spinal thoracic injury (ECF No. 33-10 at 3, ¶ 3), a fact that Peters fails to address in her opposition. Even her own deposition testimony runs counter to the assertion in her declaration that she could have performed the essential functions of her job. Peters testified that she was on crutches for two to three months after her injury, meaning that she could not drive, could not put any pressure on her knee, and experienced swelling for months. ECF No. 28-1 at 103:16–104:17; 105:19–24. Finally, the findings of fact from her workers' compensation claim state that she was seeking total temporary disability. ECF No. 33-10 at 2. "Total temporary disability" means *incapacity* resulting from an accident arising out of and in the course of employment which prevents the covered worker from engaging, for remuneration or profit, in any occupation for which the worker is or becomes reasonably fitted by education, training or experience. NRS § 616A.340 (emphasis added). If Peters was totally temporarily disabled, as was determined by her workers' compensation appeals officer, then she would not have been able to perform the essential functions of the Elections Officer position. There is thus a lack of genuine dispute that Peters could not have performed the essential duties of her job. Peters thus was not a qualified

individual under the ADA, and summary judgment is appropriate on both her ADA discrimination and state law disability-discrimination claims.[2]

*b. Clark County is entitled to summary judgment on Peters' state law claim for retaliatory discharge.*

Peters alleges that she was terminated in retaliation for filing a workers' compensation claim. ECF No. 23 at 3–4. "An employer commits a tortious discharge by terminating an employee for reasons which violate public policy." *D'Angelo v. Gardner*, 819 P.2d 206, 212 (Nev. 1991). Nevada "recogniz[es] that retaliatory discharge by an employer stemming from the filing of a workmen's compensation claim by an injured employee" is actionable under a theory of tortious discharge. *Hansen v. Harrah's*, 675 P.2d 394, 397 (Nev. 1984). However, a plaintiff may recover under a tortious discharge theory only when the protected activity is the proximate cause of the termination. *Allum v. Valley Bank of Nev.*, 970 P.2d 1062, 1066 (Nev. 1998).

Clark County asserts that summary judgment on this claim is appropriate because Peters did not bring her tort claim within two years, as required by Nevada law. ECF No. 27 at 20.[3] Peters responds that an emergency directive issued during the COVID-19 pandemic tolled Nevada's tort claim presentment statute such that she did not have to bring her claim within the standard two years. ECF No. 33 at 18–19. Clark County replies that the directive does not apply

[2] The parties also dispute whether Clark County engaged in the interactive process to determine if Peters could have been reasonably accommodated to perform her job despite her disability. However, "an employer is obligated to engage in the interactive process only if the individual is 'otherwise qualified.'" *Anthony*, 955 F.3d at 1134 (quoting *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1110–11 (9th Cir. 2000) (en banc), *vacated on other grounds sub nom. US Airways, Inc. v. Barnett*, 535 U.S. 381 (2002)). An employee is "otherwise qualified" if they could perform the "essential functions of [their] job once provided the reasonable accommodation of reassignment" and "unless a disabled individual independently satisfies the job prerequisites, [they are] not 'otherwise qualified,' and the employer is not obligated to furnish any reasonable accommodation." *Id.* (quoting *Johnson*, 666 F.3d at 565–66). Because Peters has not demonstrated any genuine dispute as to whether she was otherwise qualified, Clark County was not obligated to engage in the interactive process. I decline to address this argument further.

[3] Clark County also raises two other arguments to support its assertion that it is entitled to summary judgment on Peters' retaliatory discharge claim. ECF No. 27 at 16–21. But because I find that Peters failed to timely bring her claim as required by NRS § 41.036(2), I grant summary judgment on that basis and need not—and do not—address the alternative arguments.

to the presentment-of-claims statute and that the statute is not subject to tolling doctrines as a matter of law. ECF No. 36 at 5–6.

The presentment-of-claims statute states that "[e]ach person who has a claim against any political subdivision of the State arising out of a tort must file the claim within 2 years after the time the cause of action accrues with the governing body of that political subdivision." NRS § 41.036(2). Peters was made aware on June 22, 2018, that her employment had ended, when she received a letter stating as much. ECF No. 23 at ¶ 1. She did not present any claims to Clark County prior to initiating this lawsuit on September 8, 2020. Gargantos Affidavit, ECF No. 27-16 at ¶ 3. Because Peters was informed of her termination on June 22, 2018, but waited to file suit until September 8, 2020, she did not adhere to the plain terms of the statute. But she argues that an exception arises because Emergency Directive 009 issued by former Governor Steve Sisolak tolled the time in which she had to present her claim. ECF No. 33 at 18.

Emergency Directive 009 states in relevant part that "[a]ny specific time limit set by state statute or regulation for the commencement of any legal action is hereby tolled from the date of this Directive until 30 days from the date the state of emergency declared on March 12, 2020[,] is terminated." ECF No. 33-7 at 3. The parties agree that the pertinent inquiry is thus whether Emergency Directive 009 applied to NRS § 41.036(2). The presentment-of-claims statute is a state statute, but it does not prescribe a specific time limit for the commencement of a legal action. It requires that a claim be filed within two years of the tortious conduct, and as other judges in this district have found, the filing of a claim is different from the commencement of a legal action (i.e., the filing of a complaint[4]). *See, e.g.*, *Hartrim v. Las Vegas Metro. Police Dep't*, 2011 WL 2690148, at *3 (D. Nev. July 11, 2011) (stating that NRS § 41.036(2) does not require the claimant to give notice as a condition precedent to filing suit and that filing the complaint was insufficient to meet the statute's requirement); *Carvajal v. Clark Cnty.*, 539 F. Supp. 3d 1104, 1119 (D. Nev. 2021) ("While the Nevada Supreme Court has authored few opinions interpreting

[4] "A civil action is commenced by filing a complaint with the court." Fed. R. Civ. P. 3.

§ 41.036(2), it has consistently held that statutes setting forth explicit time restrictions are generally mandatory and that substantial compliance with those statutes will not suffice—particularly when the statute, as here, does not include a 'built-in grace period or safety-valve provision.'" (citing *Leven v. Frey*, 168 P.3d 712, 717–18 (Nev. 2007); *Vill. League to Save Incline Assets, Inc. v. State ex rel Bd. of Equalization*, 194 P.3d 1254, 1259–60 (Nev. 2008))).

This interpretation of Emergency Directive 009—that it distinguishes between statutes of limitation ("time limit set . . . for the commencement of any legal action") and time limits to present a claim—is supported by the fact that the directive does not explicitly include language tolling any time limit related to claim-presentment or claim-notice statutes, whereas similar pandemic-related orders in other states did so. *Cf. Phelps v. Wellpath Mgmt., Inc.*, 2022 WL 17084187, at *3 (D. Ore. Nov. 18, 2022) (similar legislation in Oregon specifically includes language to extend the time to "commence the action or give notice of the claim"). Emergency Directive 009 could have included such language; it did not. "If from the plain meaning of the statute [legislative] intent is clear, that is the end of the matter." *Royal Foods Co., Inc. v. RJR Holdings, Inc.*, 252 F.3d 1102, 1106 (9th Cir. 2001) (citing *Chevron USA v. Natural Res. Def. Council*, 467 U.S. 837, 843 (1984)). By its plain terms, NRS § 41.036(2) is not a statute for the commencement of any legal action and is thus not covered by Emergency Directive 009. Because the emergency directive did not toll the time in which Peters had to present a claim to the county, and it is undisputed that she failed to present any claim within two years of being informed of her termination, that claim is time-barred, and summary judgment is appropriate in the county's favor.

*c. Clark County is entitled to summary judgment on Peters' claim for race discrimination and a hostile work environment.*

Peters also alleges that she was subjected to racial discrimination and a hostile environment in violation of 42 U.S.C. § 1981. She alleges that she was "subjected to harassment by Hispanic supervisors and co-workers" to which other, non-African American employees were not subjected. ECF No. 33-1 at ¶¶ 15–16. The allegations of harassment include "humiliating her

by playing tricks on her by telling her she needed 3-D movie glasses to complete certain training, speaking in Spanish about Ms. Peters as though she were 'a dog,' 'being excluded from birthday parties and other social occasions in the office or being attended by other employees, especially Spanish speaking, Hispanic employees,' and 'being subjected to negative comments about her age, and age-related abilities.'" *Id.*

"Hostile environment" harassment refers to situations in which employees work in offensive or abusive environments. *Ellison v. Brady*, 924 F.2d 872, 875 (9th Cir. 1991). Whether an environment is "hostile" or "abusive" is a matter that "can be determined only by looking at all the circumstances." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). "When analyzing § 1981 claims, [courts] apply the same legal principles as those applicable in a Title VII disparate treatment case," although administrative exhaustion is not a requirement. *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1103 (9th Cir. 2008) (quoting 42 U.S.C. § 1981(b)). Like Title VII, § 1981 is not a "general civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (discussing Title VII). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Id.* (internal citation omitted); *see also Jordan v. Clark*, 847 F.2d 1368, 1374–75 (9th Cir. 1988) (finding no hostile work environment when "off-color" jokes were told in workplace). Rather, "[t]he working environment must both subjectively and objectively be perceived as abusive." *Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir. 1995) (citing *Harris*, 510 U.S. at 21–22). The circumstances that determine whether an environment is abusive "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Nichols v. Azteca Rest. Enter.*, 256 F.3d 864, 872 (9th Cir. 2001) (quoting *Harris*, 510 U.S. at 23). A single incident of harassment "can support a claim of hostile work environment because the frequency of the discriminatory conduct is only one factor in the analysis." *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 967 (9th Cir. 2002) (internal quotation marks omitted).

However, for a single incident to suffice, it "must be extremely severe." *Brooks v. City of San Mateo*, 229 F.3d 917, 926 (9th Cir. 2000).

In order to survive summary judgment, Peters must raise a triable issue of fact as to whether (1) she was "subjected to verbal or physical conduct" because of her race, (2) "the conduct was unwelcome," and (3) "the conduct was sufficiently severe or pervasive to alter the conditions of [plaintiff's] employment and create an abusive work environment." *Kang v. U. Lim Am., Inc.*, 296 F.3d 810, 817 (9th Cir. 2002). Peters falls short of that burden. Her allegations fail to allege behavior on the part of the county that rises to the level of a hostile work environment. While she alleges comments and actions that were potentially humiliating, Peters fails to connect those comments to her race. There is not a scintilla of evidence in the record demonstrating that Peters was subjected to her coworkers' pranks or Spanish-language comments because Peters was black. For example, when Peters describes the incidents in which she was told by a Spanish-speaking coworker that the other Spanish speakers were making fun of her, she indicates that her coworker "didn't say" whether the insults were race-based. ECF No. 28-1 at 85. When asked whether there was anything that happened that made Peters feel as though the elections department constituted a hostile work environment based on race, Peters stated that she felt that way because of complaints from other black coworkers. *Id.* at 14–16. When asked for details, Peters states that she "didn't really witness other people that much," and that she could not "remember [the] names" of the coworkers who allegedly complained to Peters about their own race-based harassment. *Id.* at 14. As for other incidents of her coworkers' rude conduct directed toward her, Peters repeatedly answers, "no," when asked whether the conduct was race-based or whether race was mentioned. *Id.* at 51, 52, 85, 97.

Moreover, her statements that she was subjected to negative and derogatory comments (many of which were in a language that she did not understand) fail to provide sufficient context that would explain how such comments give rise to a claim of hostile work environment. For example, "speaking in Spanish about Ms. Peters as though she were 'a dog,'"

and "being excluded from birthday parties and other social occasions in the office or being attended by other employees"[5] with no context regarding who made the statements, how the statements were offensive, how often she was subjected to the comments, how many individuals made the comments, how often she was excluded, etc., fail to show that the comments were either subjectively or objectively hostile. *See, e.g.*, *Kortan v. Calif. Youth Authority*, 217 F.3d 1104, 1106-11 (9th Cir. 2000) (holding that crass and denigrating comments about a female employee were insufficient to establish a hostile-work-environment claim, in part, because the comments were concentrated on one occasion); *Vasquez v. County of Los Angeles*, 349 F.3d 634, 643–44 (9th Cir. 2003) (holding a coworker's isolated remarks, six months apart, that an employee had "a typical Hispanic macho attitude" and "should consider transferring to the field because 'Hispanics do good in the field'" were not severe enough to create a hostile work environment); *Ray v. Henderson*, 217 F.3d 1234, 1245 (9th Cir. 2000) (holding that "[n]ot every insult or harassing comment will constitute a hostile work environment," but that "[r]epeated derogatory or humiliating statements . . . can constitute a hostile work environment"). As Clark County points out, "[a]s Peters is not even aware what was supposedly said about her, it follows that she cannot meet her burden to show that the comments were in fact race-based." ECF No. 27 at 23.

Ultimately, the only evidence in the record indicating that the Elections Office had a hostile work environment is Peters' own subjective, unsupported belief that her coworkers' rudeness was based on her race. ECF No. 28-1 at 121; ECF No. 33-2 at 7 ("I thought it was obvious that race and ethnicity were involved in this behavior to me."). But "[i]n evaluating the significance of the statements in question, [courts] consider the objective hostility of the workplace from the perspective of the plaintiff." *McGinest*, 360 F.3d at 1115 (citing *Nichols*, 256 F.3d at 872). And while the incidents in question constitute objective rudeness toward Peters, nothing indicates that they are at all race-based and thus hostile. *See, e.g.*, *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006) ("A supervisor's refusal to invite an employee to lunch is

[5] *See generally* ECF No. 28-1 at 46–84.

normally trivial, a nonactionable petty slight."); *Minus v. West*, 2003 WL 21295122, at *8 (E.D.N.Y. May 30, 2003) (allegations that no African Americans were invited to supervisor's birthday party, among other conduct, did not create conditions severe or pervasive enough to establish an abusive working environment). Peters' vague allegations fall short of demonstrating that she was subjected to severe or pervasive harassment, much less harassment based on her race. Therefore, Clark County's motion for summary judgment on her hostile-work-environment claim is granted.

## IV. Conclusion

IT IS THEREFORE ORDERED that defendant Clark County's motion for summary judgment **[ECF No. 27] is GRANTED** on all of Peters' claims. The Clerk of Court is directed to enter judgment accordingly and CLOSE THIS CASE.

DATED: May 18, 2023

_______________________________
Cristina D. Silva
United States District Judge